JOE C. AND NORMA J. DAVIS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Davis v. Commissioner
Docket No. 2675-71.
United States Tax Court
T.C. Memo 1976-130; 1976 Tax Ct. Memo LEXIS 272; 35 T.C.M. (CCH) 581; T.C.M. (RIA) 760130; April 26, 1976, Filed Joe C. Davis, pro se. [1]
*273 Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. His report was filed on January 21, 1976, and subsequently the petitioners filed exceptions to his report. The exceptions have been considered and are rejected. Accordingly, the Court agrees with and adopts the report which is set forth below. REPORT OF SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case is one of a group of 37 which were consolidated for trial, but not for opinion. At the trial evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the husband- petitioners' employers, Lockheed Aircraft Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron"), and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent determined *274 deficiencies in petitioners' Federal income taxes for the years 1967, 1968, and 1969 in the respective amounts of $126.78, $725.50, and $492.98.The only issue for decision is whether all or any portion of the per diem payments received by petitioner Joe Davis (hereinafter, "petitioner") from Lockheed in each of the taxable years is includible in his gross income for such years under section 61(a) (1) of the Internal Revenue Code of 1954; [2] and, if so, whether petitioner is entitled to deduct an amount equal to all or any portion of the includible per diem payments, as away-from-home traveling expenses under section 162(a)(2). Respondent's partial disallowances of petitioners' claimed medical expense deductions were predicated solely upon his increase in petitioners' adjusted gross income consequent upon the inclusion of the per diem payments. Therefore, the propriety of respondent's partial disallowances is dependent solely upon the per diem/ travel expense issue. FINDINGS OF FACT Petitioners, husband and wife, filed their 1967 return with the Internal Revenue *275 Service Center servicing the district of California. Their 1968 and 1969 returns were filed with the Service Center at Chamblee, Georgia. The evidence of record does not establish what was petitioners' residence at the time they filed their petition in this case. Petitioner was employed by Lockheed as a lead man or supervisor of several field teams during the taxable years here involved. That company, as well as Dynalectron, had a contract with the United States Air Force in each of the taxable years to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force *276 insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below). (a) In the CONUS (No quarters and *277 messing facilities furnished by the Government)-- $11.00-Per day per man for Engineer and Leadman and $9.00-Per day per man for the remainder. * * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. Hwever, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic *278 contract, work orders could only be issued during a given year of a basic contract. However, completion of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would them proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. *279 Whenever a contractor hired a new employee for field team work, that employee was advised that he was subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Locheed and Dynalectoron where involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed *280 had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor.One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. *281 Instances occurred when the composition of the field team was changed as the result of the recommendation of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors *282 in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. Petitioner was hired by Dynalectron in 1961 and worked for that company until 1966. He was then hired some time in 1966 by Lockheed and assigned to Key Field at Meridian, where he remained until January 1968. Toward the end of 1967, Lockheed's representatives advised him that shortly he would be sent as team leader on an extensive *283 8 1/2-month tour of duty for a program involving a sophisticated and highly complex installation requiring a secret clearance for him and the members of his team. In January 1968, he was sent to March Air Force Base in southern California as the first assignment on the tour. He remained there until July 26 when he was transferred to Fairchild Air Force Base at Spokane, Washington. Thereafter on August 22, he was transferred to the third assignment at Barksdale Air Force Base near Shreveport, Louisiana. About six weeks later, in September 1968, petitioner was until August 23, 1969. As a result of Lockheed's being supplanted by Dynalectron, the former then transferred petitioner to Maxwell Air Force Base at Montgomery, Alabama, where he remained for the rest of the year. Petitioner's wife and their four children accompanied him when he was initially assigned to Meridian in 1966 and the family lived there until petitioner was transferred to California. They accompanied him to that assignment and the family lived in California until petitioner was transferred to Spokane.Petitioner left Mrs. Davis and the children with her sister in Seattle while he proceeded on to Spokane. After *284 the Spokane assignment was completed, the family came back east for petitioner's assignment at Shreveport. Petitioner did not take the family to Shreveport, but instead obtained living quarters for them at Meridian, to which place he knew that he would be coming upon his completion of his Shreveport assignment. At the end of the Shreveport assignment, petitioner did come to Meridian and the family again lived together during the entire time of the Meridian and Montgomery assignments. Petitioner advised Lockheed that his "domicile town and state" was Springfield, Missouri. That was the home of his and his wife's parents and was the locality where petitioner and his wife had been raised. Petitioner had no property, real or personal, in Springfield in the taxable years, during which he visited Springfield once in 1967 on vacation.Lockheed withheld Missouri income taxes from his wages during the taxable years. When petitioner traveled between assignments or was sent overseas on assignments, his parents or his wife's brother forwarded mail to him from Springfield. Petitioner purchased automobile licenses in 1967 and 1968 in Mississippi, and in 1969 in Alabama. He had bank accounts *285 in Meridian and in California during such years. Petitioner received per diem payments from Lockheed in the amounts of $850, $3,834, and $2,585 for the years 1967, 1968, and 1969, respectively, none of which did he include in gross income on his returns. Respondent determined that each of those amounts was includible in petitioner's gross income for the year received, under section 61. OPINION It must first be determined whether the per diem payments received by petitioner from Lockheed in 1967, 1968, and 1969 are includible in his gross income for those years. It is believed that they are. In very broad language, section 61(a)(1) provides that "gross income means all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion," ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and the Code contains no provision exempting *286 per diem payments from taxation. Manifestly, them, the respondent was correct in including in petitioner's gross income the per diem payments which he received from Lockheed during the taxable years. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (C.A. 8) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341.[4]
The question remains whether petitioner is entitled to deduct under section 162(a)(2) amounts equal to all or any portion of the includible per diem for each year, as expenses of travel while away from home in pursuit of his trade or business as an employee of Lockheed, Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. *287 In the present case, the parties differ only on the point of whether petitioner was away from home. In the case of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized. It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of *288 time. Beatrice H. Albert,13 T.C. 129, 131 (1949). On the other hand, if a taxpayer chooses for personal reasons to maintain a family residence far from his principal place of employment, then his additional traveling and living expenses are incurred as a result of that personal choice, and are therefore not deductible. Commissioner v. Flowers,supra;Ronald D. Kroll,supra at 561-562; Floyd Garlock,34 T.C. 611, 614 (1960); Mort L. Bixler,5 B.T.A. 1181, 1184 (1927). Similarly, if a taxpayer accepts indefinite employment outside the vicinity in which he lives, but he does not change his family residence, the travel to his new place of employment and the additional living costs which he incurs there result, not from his employment but from his decision not to move his residence. Rendell Owens,50 T.C. 577 (1968); Maurice M. Wills,48 T.C. 308 (1967), affd. 411 F.2d 537 (C.A. 9, 1969). Thus, the deductibility of traveling expenses and duplicate living expenses depends upon the ultimate question of whether the taxpayer, under all the circumstances, *289 could reasonably have been expected to move his residence to the vicinity of his employment. Two points are thus presented: Were petitioner's assignments temporary, as opposed to indefinite? And, did he maintain two places of abode and thereby incur additional and duplicate living expenses? With respect to the first point, respondent concedes that all of petitioner's assignments in 1967, 1968, and 1969 were temporary except the first Meridian assignment in 1967, which he urges was indefinite. Considering the contractual arrangements between Lockheed and the Air Force and between petitioner and Lockheed -- all described in the Findings of Fact -- and especially the fact that petitioner knew toward the end of 1967 that he would shortly be leaving Meridian on the three-assignment tour, it appears that the 1967 assignment should be regarded as temporary, rather than indefinite. Coming to the second point, whether petitioner maintained two places of abode and thereby incurred those additional and duplicate living expenses to mitigate the burden of which is the aim and purpose of the deduction afforded by section 162(a)(2), the facts make clear that, with two exceptions (the Spokane *290 and Shreveport assignments) petitioner did not maintain two places of abode at any of his assignments. At all the rest -- Meridian (both the first and second ones), California, and Montgomery -- his wife and children were with him. They ate, slept, worked -- in short, made their home -- in the cities of those assignments, and not at Springfield, Missouri, or any other place. As a result, petitioner incurred only one set of living expenses on those assignments, which must be regarded as merely those personal, living, or family expenses barred deduction by section 262. Turning to the exceptions, and first to Spokane, the facts show that petitioner left his wife and children in Seattle with her sister, so as to minimize expenses, while he proceeded on to his assignment in Spokane. Normally, of course, a taxpayer's home is where he works, and in this instance that would be Spokane.Certainly, the taxpayer's home could not be considered Seattle. Whatever, if any (bearing in mind that Mrs. Davis and the children stayed with his sister), additional and duplicate living expenses petitioner incurred by having his family at Seattle while he worked in Spokane, must be regarded as the result *291 of his personal choice to leave his family in Seattle while he worked in Spokane. Next, and finally, the Shreveport assignment will be considered. Here, the evidence establishes that petitioner knew that he would be coming to Meridian to work after the short assignment in Shreveport, and he established his family at Meridian, while he proceeded on to Shreveport. Meridian certainly became petitioner's tax home when he went there six weeks later, and it is believed that it should also be regarded as his tax home during his short, temporary stint at Shreveport. The result is that petitioner did maintain two places of abode and incur additional and duplicate living expenses at Shreveport and he should be allowed a deduction of $462 (42 days at $11 per day), as away-from-home expenses under section 162(a)(2) for 1968; but he is not entitled to any further deduction for that year, or any deductions for the years 1967 and 1969. * * * * *
In accordance with the foregoing, Decision will be entered under Rule 155.
Footnotes
1. DQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.